IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ERNESTO RODRIGUEZ ORDUNEZ,

                Petitioner,

v.                                                CIV 12-0792 JCH/KBM

PENITENTIARY OF NEW MEXICO,
JAMES LOPEZ, Warden,

                Respondent.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Petitioner's counseled, and second amended, petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as well as Respondent's Answer and Motion to Dismiss. *See Docs. 8, 16-18.* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") standards apply, and all of the issues can be resolved on the present record rendering an evidentiary hearing unnecessary. *See, e.g., Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246 (2007); *Johnson v. Mullin,* 505 F.3d 1128, 1133 (10th Cir. 2007) *Thacker v. Workman,* 678 F.3d 820, 836 (10th Cir. 2012), *cert. denied,* 133 S. Ct. 878 (2013); Rule 8(a), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.

## I.  Procedural Overview

In May 2008, a jury convicted petitioner of three counts of aggravated assault with a deadly weapon (using a car), *see Doc. 16-1* at 4, 6-7, 20, and one count of

bribery or intimidation of intimidation of a witness through threats, *see id.* at 10, 20.  The jury found him not guilty of conspiracy to commit aggravated assault.  *See id.* at 8.  On September 18, 2008, with enhancements for being a habitual offender, the trial judge sentenced Petitioner to a total of 12½ years of incarceration, followed by 2 years of parole.  *See id.* at 22.

The federal habeas petitions raise an unspecified sufficiency of the evidence claim, and fourteen separately-numbered instances of alleged ineffectiveness by trial counsel.  As discussed later, the sufficiency and other claims will not be addressed because, among other things, counsel has abandoned them.

The state proceedings followed an unusual path, and various attorneys represented Petitioner during them.  Judge Doug Driggers presided at trial and sentencing, and Judge Lisa Schultz presided during post-conviction proceedings.  *See State v. Ordunez,* D-307-CR-200700192 (docket sheet).  Then-state public defenders Gregory Garvey and Margaret Strickland represented Petitioner during trial.  *See, e.g., Doc. 8* at 2 (¶ 2); *Doc. 8-2* at 1 ("*Transcript I*"); *Doc. 16-1* at 27, 29.  After entry of the judgment against her client, Ms. Strickland filed the appeals docketing statement, and then state appellate public defender Stephanie Brunson represented Petitioner on direct appeal and in a petition for certiorari with the New Mexico Supreme Court.  *See Doc. 16-1* at 27, 57; *Doc. 16-2* at 1.

The Court of Appeals' June 29, 2009 decision resulted in a partial victory for the defense when it found the evidence insufficient to support Petitioner's bribery conviction.  *See Doc. 16-1* at 67, 69; *see also State v. Ordunez,* No. 28, 996, 2009 WL 6567156 (N.M. App. Jun. 29, 2009) ("*Ordunez I*").  Although the State had filed a motion

for rehearing on July 14, 2009 and served Ms. Brunson with the document by hand
delivery, she petitioned the New Mexico Supreme Court for certiorari on July 20, 2009
to "exhaust[] of state remedies." *See, e.g., Doc. 16-1* at 71, 78, *Doc. 16-2* at 2 (file
stamp date not entirely clear); *see also Doc. 16* at 7 (stating petition filed July 20, 2009);
*Doc. 16-3* at 13-14 (subsequent public defender petition recounting procedural history).
Ms. Brunson did not mention the pending motion for rehearing to the New Mexico
Supreme Court in the petition.  The New Mexico Supreme Court docket sheet reflects
only the petition and its August 18, 2009 denial of certiorari.  *See Doc. 16-2* at 29; *Doc.
16-4* at 24; *see also State v. Ordunez,* 147 N.M. 395, 223 P.3d 940 (N.M. 2009).

    Petitioner then initiated state habeas relief pro se on October 30, 2009.  *See
Doc. 16-2* at 30.  He apparently was unaware of the developments on rehearing in the
Court of Appeals, because he submitted an attachment that highlighted where the Court
of Appeals reversed his bribery conviction, and did not otherwise mention a motion for
rehearing.  *See id.* at 30, 47; *Doc. 16-3* at 14.  Judge Schultz summarily denied relief on
the merits a few days later and noted the thirty-day deadline in which to petition the New
Mexico Supreme Court for certiorari under Rule 5-802(H).  *See Doc. 16-2* at 60-61.

    Petitioner missed that deadline, as his pro se petition for certiorari is file-stamped
December 14, 2009.  *See id.* at 63; *Doc. 16* at 7.[1]  The New Mexico Supreme Court
overlooked his untimely submission, however, when it denied the petition on January 7,

---

[1] A state public defender's filing mistakenly states that Petitioner filed the certiorari petition on
December 10, 2009, which is the last day it could have been timely filed.  *See Doc. 16-3* at 14.
New Mexico does not recognize a "prison mailbox rule," so pro se filers will not meet an
applicable deadline unless the state court receives and file-stamps their submissions before the
deadline passes.  *See Garcia v. Shanks,* 351 F. 3d 468, 472 (10th Cir. 2003); *Adams v.
LeMaster,* 223 F.3d 1177, 1181 (10th Cir. 2000).  It appears Petitioner may have mailed this
petition from Hobbs to Santa Fe as late as December 8, 2009.  *See Doc. 16-2* at 64, 71.

2010 without expressly enforcing the default. *See Doc. 16-2* at 75.[2]  Petitioner did not

move for rehearing.  *See Serrano v. Williams,* 383 F.3d 1181, 1185 (10th Cir. 2004).

     Meanwhile, on July 30, 2009, the Court of Appeals granted the State's motion for

rehearing, withdrew its prior opinion, issued a third summary opinion, reversed itself on

the bribery conviction, and now proposed affirming all of Petitioner's convictions.  *See*

*Doc. 16* at 7; *Doc. 16-2* at 25-28; *Doc. 16-3* at 13; *see also State v. Ordunez,* No.

28996, 2010 WL 4550656 (N.M. App. Jul. 6, 2010) ("*Ordunez II*").  Ms. Brunson's last

day of work with the Appellate Division happened to be the very next day, July 31, 2009.

*See Doc. 16-3* at 13.

     For reasons that are not clear, the Court of Appeals, the public defender, and the

State all failed to respond to the third proposed notice by the deadline for doing so.

Instead, the matter languished for almost a year until assistant appellate defender

Kathleen Baldridge undertook representation of Petitioner and asked the Court of

Appeals to accept her June 18, 2010 memorandum in opposition "as timely filed."

*Ordunez II*, 2010 WL at *1; *Doc. 16-3* at 1.  It did so, but was not persuaded by her

arguments, and on July 6, 2010, issued a final opinion consistent with its third summary

proposal.  *Id.*

     On July 9, 2010, Ms. Baldridge filed a second petition for certiorari, again for the

---

[2]  A federal habeas court will not consider a procedural default when the state courts did not enforce the state procedural rule.  *See Maples v. Thomas,* ___ U.S. ___, 132 S. Ct. 912, 922 (2012) ("As a rule, a state prisoner's habeas claims may not be entertained by a federal court 'when (1) a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement'") (internal quotations omitted) (quoting *Walker v. Martin,* 562 U.S. ___, ___, 131 S. Ct. 1120, 1127 (2011), and *Coleman v. Thompson,* 501 U.S. 722, 279-30 (1991); *see also, e.g., Ylst v. Nunnemaker,* 501 U.S. 797, 801 (1991); *Harris v. Reed,* 489 U.S. 255, 264, n.10 (1989); *Wogenstahl v. Mitchell,* 668 F.3d 307, 321 (6th Cir. 2012); *Cannon v. Mullin,* 383 F.3d 1152, 1172 (10th Cir. 2004).

purpose of exhausting Petitioner's "direct appeal."  *Doc. 16-3* at 14 (date unclear); *see also Doc. 16* at 8 (filed July 9, 2010).  The New Mexico Supreme Court summarily denied the petition on Tuesday, August 10, 2010.  *See Doc. 16-3* at 29; *see also State v. Rodriguez-Ordunez,* 148 N.M. 942, 242 P.3d 1288 (N.M. 2010).  Nothing in the record shows that the public defender petitioned the Supreme Court of the United States within the allotted ninety-day period, which would have run on Monday, November 8, 2010.

Attorney Jose Coronado instituted another round of state habeas relief by filing a comprehensive petition for habeas relief on July 5, 2011.  *See Doc. 16-3* at 31-46.  Mr. Coronado also represents Petitioner in these federal proceedings.  The State filed a comprehensive response, and on January 24, 2012, Judge Schultz summarily denied the petition on the written submissions.  *See Doc. 16-3* at 48-64.  Mr. Coronado secured an extension and filed an extensive certiorari petition.  *See Doc. 16-4* at 1-20.  The New Mexico Supreme Court summarily denied it on Tuesday, March 27, 2012.  *See Doc. 16-4* at 23.  With an additional fifteen days in which Petitioner could have filed a motion for rehearing, the second round of state post-conviction proceedings concluded on Wednesday, April 11, 2012.

## II.  Initial Considerations

### A. Timeliness

The applicable one-year federal statute of limitations runs from the latest of four possible triggering events.  Based on the record and the federal claims, the only option here is the date on which Petitioner's conviction became "final."  *See, e.g., Purkey v. Kansas,* 281 F. App'x 824, 826 & n.2 (10th Cir. 2008); 28 U.S.C. §§ 2244(d)(1)(A)-(D).

"Finality" for this purpose means the "'conclusion of direct review or the expiration of the time for seeking such review,'" 28 U.S.C. § 2244(d)(1)(A), which includes the ninety-day period for petitioning the Supreme Court of the United States after the state direct appeal proceedings conclude, *see, e.g., Jimenez v. Quarterman,* 555 U.S. 113, 119-20 (2009).  Finality does not mean "after all possible claims can be brought and considered in state court proceedings [or] post-conviction and other collateral proceedings."  *Daniel v. Trani,* ___ F. App'x, ___ , ___, No. 12-1291, 2013 WL 646395, at *1 (10th Cir. Feb. 22, 2013) (citing *Redd v. McGrath,* 343 F.3d 1077, 1081 (9th Cir. 2003)).

Habeas counsel asserts that the original federal petition was timely because it was due by August 12, 2012, and he filed it on July 19, 2012.  He does not explain how he arrived at this calculation.  *See Doc. 8* at 19-20 & n.2; *see also Docs. 1, 1-1, 1-2, 1-3* (original petition filed in segments).  Respondent does not challenge any of the federal petitions on timeliness grounds or mention timeliness at all, which might be construed as a waiver.[3]  Regardless, a federal habeas court may visit the timeliness issue sua sponte, and the Court did so here because of the age of the conviction and the unusual state proceedings that can complicate the calculation for federal limitations purposes. *See, e.g., Day v. McDonough,* 547 U.S. 198, 209 (2006); *United States v. Ryan,* No. 12–2143, 2013 WL 1136973, at *1 (10th Cir. Mar. 20, 2013); *Foust v. Jones,* No. 12-

_____

[3]  *See, e.g., Wood v. Milyard,* ___ U.S. ___, ___, 132 S. Ct. 1826, 1835 (2012) ("Waiver is the 'intentional relinquishment or abandonment of a known right. . . .  The State's conduct in this case fits that description.  Its decision not to contest the timeliness of Wood's petition did not stem from an inadvertent error . . .  Rather, the State, after expressing its clear and accurate understanding of the timeliness issue . . . deliberately steered the District Court away from the question and towards the merits of Wood's petition.  In short, the State knew it had an arguable statute of limitations defense . . . yet it chose, in no uncertain terms, to refrain from interposing a timeliness challenge to Wood's petition.  The District Court therefore reached and decided the merits of the petition.  The Tenth Circuit should have done so as well.") (internal quotations, citations, and alterations omitted).

5111, 2012 WL 6119976, at *2 (10th Cir. Dec. 11, 2012).

The Court finds that the original federal petition was due no later than mid-August 2012.[4]  Ms. Brunson's petition for certiorari was premature in light of the motion for rehearing because, by granting rehearing, the Court of Appeals suspended its original decision.[5]  The state public defender's subsequent failure to timely file a memorandum

_____

[4]  Habeas counsel filed amended federal petitions on August 27, 2012, and August 29, 2012, pursuant to the Court's request to clarify that he was bringing the action under "28 U.S.C. § 2254" (the habeas statute governing state petitions), as opposed to "28 U.S.C. § 2255" (the habeas statute governing federal convictions cited in the original petition).  *See Docs. 1, 4-8.* The Court's request for clarification did not authorize additional claims, and counsel did not request permission to add any.  *See Docs. 4, 5.*  Nevertheless, the first amended petition added an unspecified sufficiency claim.  The second amended petition retains the newly-added claim and simply corrected typographical errors in statute citations.  *See Doc. 6* at 14; *Doc. 8* at 1, n.1 & 13-14.

Because the amended petitions raised the new sufficiency claim, they do not "relate back" to the date of the originally-filed petition, and thus fall outside the mid-August limitations period.  *See Kinkead v. Standifird,* ___ F. App'x ___, ___, No. 12–5126, 2012 WL 5871032, at *2 (10th Cir. Nov. 21, 2012) ("claim that is 'totally separate and distinct, in both time and type from those raised' in the original petition does not relate back") (quoting *United States v. Espinoza–Saenz,* 235 F.3d 501, 505 (10th Cir. 2000)).  Tolling is also inapplicable as a matter of law because the "pendency of a federal habeas case does not toll the limitations period."  *Id.* (citing 28 U.S.C. § 2244(d)(2)).  Equitable tolling would apply if Petitioner could show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' to prevent timely filing" of the sufficiency claim.  *Id.* (quoting *Holland v. Florida,* ___U.S. ___, ___, 130 S. Ct. 2549, 2562 (2010)).  However, errors by counsel do not qualify as a basis for tolling.  *See, e.g., Santini v. Clements,* No. 12-1266, 2012 WL 4748177, at * 3 (10th Cir. Oct. 5, 2012) (citing *Holland,* 130 S. Ct. at 2664).

[5]  Under New Mexico Rule 12-502(B), a petition for certiorari is due within a specified number of days "after final action by the Court of Appeals."  N.M. Rule § 12-502(B).  "Final action by the Court of Appeals shall be the filing of its decision . . . unless timely motion for rehearing is filed, in which event, final action shall be the disposition of the last motion for rehearing."  *Id.; see also, e.g., Wesley v. Snedeker,* 159 F. App'x 872, 873 (10th Cir. 2005).  Unless otherwise "shortened or enlarged by order," motions for rehearing are to be "filed within fifteen (15) days after filing of the appellate court's disposition" and the "three (3) day mailing period set forth in Rule 12-308 . . . does not apply to [these] time limits."  N.M. Rule 12-404(A).   The Court of Appeals issued its decision on Monday, June 29, 2009, making the State's motion due by July 14, 2009.  *See* N.M. Rule 12-308(A) (for time frames of more than eleven days, time computed by excluding date that Court of Appeals issued decision, and includes weekends unless due date falls then).  Because the State filed its motion to reconsider on that date, the motion was timely.  And, "[t]he granting of a motion for rehearing shall have the effect of suspending the decision or opinion of the court until a final determination by the appellate court."  N.M. Rule 12-404(C).

in opposition to the third proposed summary disposition was not a "default" under the

state rules, if for no other reason than because the Court of Appeals accepted the

belated opposition as timely filed.[6]  Similarly, even if the direct appeal concluded as a

matter of state law when no objections were filed to the third proposed summary

affirmance, the Court of Appeals' decision to consider the late submission effectively

"reopened" any such lapsed proceeding.[7]

### B.  Sufficiency Claim Is Unauthorized Amendment, Untimely and Abandoned

Footnote Four discusses habeas counsel's addition of a sufficiency claim to the

federal petition, and finds that the claim is an unauthorized and untimely amendment.

Those reasons eliminate the sufficiency claim from consideration on the merits.

---

[6] When the Court of Appeals issued its new proposed disposition and reassigned the matter to the summary calendar, the public defender's memorandum in opposition thus became due "on or before August 20, 2009." *Doc. 16-3* at 14.  As the proposed notice highlights, the proposed disposition is not a "final decision," and the parties had "(20) days to file a memorandum" under Rule 12-210(D)(3).  The New Mexico summary calendar rules contemplate that the Court of Appeals will act after the time passes for filing memoranda.  It has three options:  "either reassign the case to a nonsummary calendar, issue another notice of proposed summary disposition or precede to decide the case by opinion or order."  N.M. Rule 12-210(D)(5).  A party is not obliged to file a memorandum in opposition, and can instead elect to petition the New Mexico Supreme Court for certiorari when the Court of Appeals issues a decision after the party's nonaction.  *See State v. Simpson,* 116 N.M. 768, 769-71, 867 P.2d 1150, 1151-53 (N.M. 1993) (when defendant failed to respond to second calendar notice, Court of Appeals affirmed and defendant petitioned for certiorari; State's argument court should remand and not review case until defendant filed memorandum rejected – "[w]hile the rule . . . gives a party ten days to file a response to a calendar notice, contrary to the State's assertion it does not require a party to file a response.");  *compare Brown v. Roberts,* ___ F. App'x ___, ___, No. 11–3085, 2012 WL 5507236, at *5 (10th Cir. Nov. 14, 2012) (Kansas Supreme Court rules provide that "failure to file a timely docketing statement 'shall be deemed to be an abandonment of the appeal'") (internal citation omitted).

[7] Although the possibility that a state will reopen its proceedings does not impact the statute of limitations calculation, under *Jimenez,* when a state court in fact enters an order that reopens direct review before a petitioner has filed for federal habeas relief, the state is "acknowledging" that direct review has not ended and the "judgment" is not yet "final."  The one-year federal statute of limitations begins to run anew from the conclusion of the reopened proceedings.  *See, e.g., Jimenez,* 555 U.S. at 120-21 & n.4; *Brown,* 2012 WL at *2.

In addition, the undefined sufficiency claim could be unexhausted depending on habeas counsel's further clarification of what it entails.  *See Doc. 18* at 12-16 (sufficiency claim challenging the bribery charge would be exhausted, while sufficiency claim challenging the aggravated assault charges is unexhausted).   However, habeas counsel does not discuss the sufficiency claim in his response, so the Court also agrees with Respondent that habeas counsel has abandoned it.  *See Doc. 27* at 5-6 & n.2; *see also Doc. 26.*

### C.  Exhaustion

Respondent contends that the second amended petition contains a mix of exhausted and unexhausted claims, specifically, the claim designated "J" that asserts trial counsel was ineffective in failing "to object to the trial court providing guidance to the state throughout the trial, which . . . helped the state establish the admission of evidence."  *Doc. 8* at 15; *see also Doc. 16* at 9-10 (¶¶ 12, 13, 15).  Respondent asks the Court to dismiss, either on the basis of lack of exhaustion or, in the alternative, because none of the claims have merit.  *See, e.g., Doc. 16* at 1; *Doc. 17* at 1; *Doc. 18* at 1.

This Court cannot grant habeas relief if a petitioner did not exhaust available state remedies.  *See* 28 U.S.C. § 2254(b)(1)(A).  Conversely, § 2254(b)(2) authorizes this Court to dismiss unexhausted claims on the merits.  *See id.,* § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Courts may sua sponte consider lack of exhaustion if the state either fails to raise the subject or considers the claims exhausted.  *See Richwine v. Romero,* 462 F. App'x 770, 773 (10th Cir. 2011) (citing *Granberry v. Greer,* 481 U.S. 129, 134 (1987), *Fairchild v.*

*Workman,* 579 F.3d 1134, 1148 n. 7 (10th Cir. 2009), and *Williams v. Jones,* 571 F.3d 1086, 1089 (10th Cir. 2009)).

A state may also waive the requirement.  However, making alternative arguments for dismissal based on lack of exhaustion or lack of merit, does not constitute the "express" waiver required under the federal statute.  *See id.* at 772 ("A state may waive the exhaustion requirement, but only if 'the State, through counsel, expressly waives the requirement.'") (quoting 28 U.S.C. § 2254(b)(3)); *see also, e.g., Rockwell v. Yukins,* 217 F.3d 412, 424 (6th Cir. 2000) (specifically rejecting argument that "failure to exhaust, alternatively without merit" constitutes express waiver).

As the parties agree, this Court has four options in the face of a mixed petition: (1) dismiss the entire petition; (2) allow Petitioner to dismiss the unexhausted claim and proceed solely with the exhausted claims; (3) stay the federal proceedings while Petitioner returns to state court to exhaust; or (4) ignore exhaustion altogether and deny the petition if none of the claims have merit.  *See Fairchild,* 579 F.3d at 1156 (citing four options identified by the Sixth Circuit in *Harris v. Lafler,* 553 F.3d 1028, 1031 (6th Cir. 2009)) (emphasis omitted); *see also Doc. 16* at 11-12; *Doc. 18* at 10-11; *Doc. 26* at 4-5.

 "'In order to exhaust his state remedies, a federal habeas petitioner must have first fairly presented the substance of his federal habeas claim to state courts.'" *Stemple v. Workman,* 418 F. App'x 732, 737 (10th Cir. 2011) (quoting *Hawkins v. Mullin,* 291 F.3d 658, 668 (10th Cir. 2002).  "Fair presentation means that the petitioner has raised the substance of the federal claim in state court."  *Id.* (internal quotations and citations omitted); *see also Picard v. Connor,* 404 U.S. 270, 278 (1971).

Habeas counsel argues that claim "J" was "fairly presented" to the state court

because it was "similar to" or "subsumed" by the other specific claims, *see Doc. 26* at 3, and it is "simply 'a bit of evidence' that did not so change the legal landscape presented to the state court [that it] did not result in alteration to the state court's legal analysis," *id.* at 4.  Respondent disagrees with this characterization.  *Doc. 27* at 3-4.

It is true that a habeas petitioner will be allowed to present bits of evidence to a federal court that were not presented to the state court that first considered his claim." *Carveness v. Roberts,* 447 F. App'x 6, 12 (10th Cir. 2011) (internal quotations omitted). The claim designated "I" is specific and asserts counsel failed to "object to the trial court directing the state how to establish a foundation of the admission of the letter," and the claim designated "J" is vague and asserts counsel failed to "object to the trial court providing guidance to the state throughout the trial, which guidance helped the state establish the admission of evidence."  *Doc. 8* at 15.  Such "general allegations" are insufficient to satisfy the exhaustion requirement or to secure federal habeas relief.  *See Carveness,* 447 F. App'x at 12.

Petitioner's attorney implicitly recognizes this because he does not want the Court to consider staying the matter while he further exhausts.  Instead, he expressly "requests that the court allow him to dismiss unexhausted claim (j) and proceed with his exhausted claims."  *Doc. 26* at 5; *see also id.* at 5-6.  As such, the Court considers the unexhausted claim "J" dismissed per counsel's request and will not require Petitioner to submit a third amended petition.

## III.  Factual Background

Domestic tensions underlie the events that gave rise to the criminal charges against Petitioner.  He and Trista Lopez have a daughter Alize, and another child

together.  When the events at issue took place, Alize was five or six years old, Petitioner

and Trista were estranged, and Petitioner was seeing Felicia Mendoza, with whom he

also has two children.  *See, e.g., Transcript I* at 83-84; *Doc. 16-2* at 3; *Doc. 16-3* at 2;

*Doc. 18* at 2-3.

At some point in 2006, Trista accused Petitioner of child abuse of one of her

other children by a different father.  *See Doc. 16-1* at 76-77; *Doc. 16-3* at 3-4.  Trista

then received a letter postmarked August 31, 2006, that stated:

> You want to fuck me over huh.  How many people know
> about your fucker Uncle touching and molstering [sic] you,
> when you were living with Grandma, I'll let your family know
> & CYFD know what happened.  Channel 9 New along with
> Fox News and N.M. News and News Paper media will be
> there.  You fuck me over and you fuck yourself.  Especially
> trying to accuse me of something I didn't do.  They will know
> about you and your suicide tendencies [sic], along with trying
> to give Juan the kids [']cause you didn't want them around.
> you know I have a big mouth.  So it's on you.

*Doc. 16-1* at 76; *see also Transcript I* at 118; *Doc. 16-3* at 4.  The actual letter and the

envelope it arrived in, are not part of the federal record.  As described by the trial judge,

the envelope showed that the letter was from "Jorge Mata," and it was mailed from P.O.

Box. 2529."  *Transcript I* at 93.

On January 17, 2007, Petitioner and Mendoza were traveling in one car, with

Petitioner driving.  Trista, her sister (Johnnie Contreras), Alize, and Contreras' eighteen-

month old daughter were traveling in another, with Contreras driving.  They encountered

each other on the road.  A fracas ensued, with a drink being thrown, and the cars

swerving, weaving, and reversing direction.  Alize can be heard screaming on the

recording of the 911 call Trista made at some point during the altercation.  *See, e.g., id.*

at 64-165, 55; *Doc. 8-3* at 19-26 ("*Transcript II*"); *Doc. 16-2* at 3; *Doc. 18* at 2-3.

The State charged Petitioner with three counts of aggravated assault by use of a deadly weapon for swerving his car toward the automobile driven by Contreras, and causing Trista, Alize, and Contreras to believe he was going to intrude on their "bodily integrity or personal safety."  *See Doc. 16-1* at 4, 6, 7 (jury instructions for Counts 1, 2, and 3).  It charged him with one count of conspiring with Mendoza to commit the aggravated assault.  *See id.* at 8 (jury instruction for Count 4); *see also Transcript II* at 52-54.  It also charged him with intimidating or threatening Trista with the car event, for the purpose of preventing her from testifying in the pending child abuse matter.  *See Doc. 16-1* at 10 (jury instruction for Count 5); *see also Transcript I* at 111-12, 118-20; *Transcript II* at 166-67, 173-75.

Trista, Alize, and Contreras testified for the prosecution.  *See Transcript I* at 2. Collectively, in their version of events, when they first saw Petitioner and Mendoza, they slowed to avoid pulling up alongside them.  That plan went awry when the car driven by Petitioner made a turn and he spotted them, followed them, and swerved his car towards their vehicle several times in an attempt to ram them.  Mendoza also threw a drink from her side of the car towards Contreras' car.  The witnesses testified they did nothing to provoke this behavior.  *See, e.g., id.* at 25-31, 37-38, 60-65, 124-30, 135-44.

Mendoza pleaded no contest to the charges brought against her as a result of the incident.  She was the sole defense witness at Petitioner's trial, and her testimony was diametrically opposed to that recited above by the alleged victims.   She testified that Trista and Contreras instigated the incident by throwing the drinks they had in Sonic cups, one of which sprayed a "little bit" on Petitioner's car.  Mendoza then retaliated by tossing the drink she had in a Roberto's Restaurant cup which landed a direct hit on the

other car.  *See Transcript II* at 82-83, 102-04.   Mendoza further testified that Petitioner

had attempted to avoid any confrontation, and that it was the vehicle driven by

Contreras that attempted to collide with Petitioners car.  *See id.* at 79-85.

## IV.  *Strickland* Standard Under AEDPA

To establish ineffective assistance of counsel under *Strickland*, Petitioner must

show counsel's deficient conduct resulted in prejudice.  *See Strickland v. Washington,*

466 U.S. 668, 687-88, 694 (1984).  The *Strickland* standards "must be applied with

scrupulous care," and the standard sets a "high bar" that is "never an easy task" to

surmount, even under a de novo review.  *Cullen v. Pinholster,* ___ U.S. ___, ___, 131

S. Ct. 1388, 1403, 1408 (2011) (internal quotations and citations omitted); *see also,*

*e.g., Harrington v. Richter,* 562 U.S. ___, ___, 131 S. Ct.  770, 788 (2011); *Padilla v.*

*Kentucky,* 559 U.S. ___, ___, 130 S. Ct. 1473, 1484 (2010); *Strickland,* 466 U.S. at 689.

The " 'purpose of the effective assistance guarantee . . . is not to improve the quality of

legal representation . . . [but] simply to ensure that criminal defendant receive a fair

trial." *Cullen,* ___ U.S. at ___, 131 S. Ct. at 1403 (quoting *Strickland,* 466 U.S. at 689).

To establish deficient conduct, Petitioner "'must show that counsel's performance

fell below an objective standard of reasonableness.'"  *Harrington,* 562 U.S. at ___, 131

S. Ct. at 787 (quoting *Strickland,* 466 U.S. at 688).  His "burden is to show 'that counsel

made errors so serious that counsel was not functioning as the counsel guaranteed . . .

by the Sixth Amendment."  *Id.* (internal quotations and citations omitted).  This Court

"must apply a strong presumption that counsel's representation was within the wide

range of reasonable professional assistance."  *Id.* (same).

"To establish *Strickland* prejudice a [petitioner] must 'show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper,* ___ U.S. ___, ___, 132 S. Ct. 1376, 1384 (2012) (quoting *Strickland,* 466 U.S. at 694).  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. . . . Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington,* 562 U.S. at ___, 131 S. Ct. at 787-88 (internal quotations to *Strickland,* 466 U.S. at 687, 693 omitted).

Under AEDPA, a state court's unexplained and summary decision is entitled to deference.  *See, e.g., Johnson v. Williams,* ___ U.S. ___, ___, 133 S. Ct. 1088, 1091 (2013); *Harrington,* ─── U.S. at 131 S. Ct. at 785.  Because the state court rejected Petitioner's ineffective assistance claims "on the merits," this Court's habeas review is "'doubly' deferential." *Harrington,* ─── U.S. at 131 S. Ct. at 788 (quoting *Knowles v. Mirzyance,* 556 U.S. ___, ___, 129 S. Ct. 1411, 1420 (2009)).  In applying the AEDPA standards, "the question is whether there is any reasonable argument" that trial counsel did not satisfy *Strickland*'s "deferential standard." *Id.*; *see also, e.g., Lopez v. Rudek,* 488 F. App'x 308, 310 (10th Cir. 2012).

Petitioner must show both *Strickland* prongs – deficient performance and prejudice – to prevail.  Failure to meet either prong is wholly dispositive of a claim, and the Court need not address both if Petitioner fails to make the requisite showing for one of the prongs.  *See, e.g., Smith v. Robbins,* 528 U.S. 259, 289 (2000); *United States v. Valdovinos,* No. 12-5158, 2013 WL 617499, at *1 (10th Cir. Feb. 20, 2013); *United States v. Castaneda,* 475 F. App'x 309, 309 (10th Cir. 2012) (citing *Cooks v. Ward,* 165 F.3d 1283, 1292–93 (10th Cir. 1998)).

# V.  Analysis

Petitioner's various ineffectiveness claims fall into six general categories: (A) failure to request hearing on pro se motions to dismiss counsel; (B) failure to bolster the defense by calling Detective Ferguson; (C) failure to object to bolstering the credibility of the prosecution witnesses by Detective Thatcher; (D) failure to request a curative instruction after Trista blurted Petitioner's status as a prisoner; (E) ineffectiveness related to the letter Trista received and her assertion of feeling intimidated and threatened; and (F) failure to object to the prosecutor's closing argument.   The partial transcripts habeas counsel submitted encompass all of the witness testimony and closing arguments.  The Court finds that it can fully resolve the issues without requiring further supplementation.

## A.  Pro Se Motions

On three occasions between May and September of 2007, Petitioner filed pro se motions that asked the trial judge to "dismiss" his state public defender and to appoint a new attorney.  He captioned the motions with the numbers of both of the criminal cases then pending against him – the action that is the subject of this habeas petition (D-307-CR-200700192) and the "abandonment or abuse of a child" case (D-307-CR-200600453).  Mr. Garvey was representing Petitioner in both cases and, at the time of the first two motions, Judge Bridgforth was presiding in both cases.  *See State v. Ordunez,* D-307-CR-200700192 (docket sheet, entries 5/7/07, 5/31/07, and 9/5/07); *State v. Ordunez,* D-307-CR-200600453 (docket sheet, entries 5/7/07, 5/31/07, and 9/5/07); *Doc. 16-2* at 50-59 (copies of the three motions).

In his first motion apparently filed in both cases, Petitioner asked the judge to appoint habeas counsel here, Mr. Coronado, to represent him instead of then-appointed counsel Mr. Garvey.  In his second and third motions, Petitioner instead asked the judge to order the state public defender to "appoint new counsel."  As grounds, Petitioner claimed Mr. Garvey was not interested in pursuing the sort of defense Petitioner desired, Petitioner did not trust him, and they were not communicating well.  *See Doc. 16-2* at 50-59.

Judge Bridgforth entered an order in the abandonment/abuse case on July 11, 2007, that denied the request, saying:

> "The Motion . . . has been copied to Defense counsel and State's counsel.  The Defendant cannot pick and choose amongst the Public Defender's Department; that is, the Court will not interfere with the discretion the District Public Defender exercises in assigning any given case.  If the assigned Public Defender agrees a conflict exists warranting reassignment that should be accomplished within the Public Defender Department.  Disagreements in strategy or in seeing 'eye to eye' do not disqualify counsel."

*Doc. 16-3* at 55-56.  Judge Bridgforth's order is not part of the federal record or electronically available, so this Court cannot tell whether he likewise captioned it with both criminal action numbers, and thereby intended it to be filed in both cases.  Accordingly, the Court will assume he only considered and entered it in the abandonment case

Also, even though Petitioner captioned his post-denial September 2007 motions as being addressed to Judge Bridgforth, it appears from the docket sheet that the assault case had been reassigned to Judge Driggers by that time as he was the judge who scheduled an August 6, 2007 trial setting before him.  Thereafter, Judge Bridgforth

ignored Petitioner's September filing in the abandonment case.  No judge entered an order disposing of the motions in the assault case.

Petitioner alleges that trial counsel was ineffective for failing to request a hearing on the pro se motions.  *See Doc. 8* at 14.  The claim was raised in both the pro se and counseled state habeas petitions.  *See Doc. 16-2* at 33; *Doc. 16-3* at 41.  Judge Schultz denied the pro se petition on initial review without ordering a response, and did not mention the arguments about the motions to dismiss.  *See Doc. 16-2* at 60-61.  In the counseled petition, the State argued that Judge Bridgforth's order in the abandonment case effectively denied the motions in the assault case, and Judge Schultz incorporated the State's reasoning in her summary denial of that petition.  *See Doc. 16-3* at 55-56, 64.  Respondent makes essentially the same argument here – that the order in the abandonment case is dispositive.  *See Doc. 18* at 18.

Habeas counsel argues that we do not know "if Petitioner's pro se motion in the other matter raised the same concerns Petitioner raised in the instant case."  *Doc. 26* at 9.  Yet the Court can tell from Petitioner's caption on the motions that the identical motion was to be filed in both cases, and the docket sheets verify that the motions were filed in both cases on the same dates.  Moreover, the federal record as it presently stands also establishes that:

- Mr. Garvey was aware of Petitioner's motions;

- Petitioner was aware that his request was denied in July 2007;

- given how he captioned the motions and that they were filed in both cases on the same exact day, it would have been unreasonable for Petitioner to assume that he would obtain different results in the different cases;

• Petitioner was aware from the ruling that if a conflict beyond what he mentioned had developed, then the public defender could reassign the case;

• while Petitioner's post-ruling September 2007 filings asserted that the relationship was deteriorating further, from that motion to May 6, 2008 when trial commenced in the assault case, Petitioner did not file any other pro se motions; and,

• while the transcript indicates that Petitioner was not loath to make his views known to the court during the course of trial, the transcript does not reflect that he objected to counsel's representation at any point during trial.

Given these circumstances, this Court cannot find Petitioner has satisfied either *Strickland* prong, and thus could not characterize the summary dismissal of the claim as "unreasonable."

## B. Bolstering Defense Version of Events - Counsel's Failure to Successfully Subpoena Detective Ferguson

When Detective Ferguson took Petitioner's statement at the scene, Petitioner told him that Trista and Contreras threw Sonic cups of soda at his car.  *See Doc. 8* at 12.  The defense considered this statement probative and impeaching of the contrary version from Trista and Contreras because "Petitioner could not have known that the alleged victims had been at the *Sonic* Drive-In unless he saw a *Sonic* cup.  Petitioner's statement to Detective Ferguson was made before Petitioner had an opportunity to see the cup or talk to any other witness in order to fabricate his story."  *Id.* (emphasis added); *see also Transcript II* at 43-44, 63-64.

Although there was a possibility Petitioner would testify, *see Transcript I* at 19, he ultimately chose not to take the stand, likely because at the time of trial he had three prior felony convictions.  *See id.* at 18; *Transcript II* at 116; *Doc. 16-2* at 34.  Defense

counsel therefore sought other means of introducing Petitioner's statement.  For

example, counsel attempted to cross-examine the last of the two detectives the state

called, Kacee Thatcher, about Petitioner's statement.  She testified, however, that she

did not take his statement, did not speak with him directly, and did not read his

statement.  She only saw a summary of his statement.  *Transcript II* at 42-43.

When defense counsel attempted to show the officer a portion the statement, the

prosecutor objected, and the trial judge sustained the objection:

> THE COURT: You have already established that she didn't
> read the defendant's statement.   And how can she be
> impeached on his statement if she doesn't know what's in
> the contents of the statement?

> [Defense]: Oh, I'm sorry. I'm not impeaching her, I'm
> impeaching the two other witnesses and the credibility of her
> investigation.  If she had read this report and seen that they
> said that, she would have questioned this case.  She brought
> this case without even looking at it, and – she brought this
> case without even looking at the defendant's statement.  It's
> the two other witnesses –

> THE COURT:   I can certainly appreciate your line of
> defense, and you have already established – I mean you can
> go into it in greater detail, but you have already established
> that she didn't read the defendant's statement.

> [Defense]:  I –

> THE COURT:  And you can argue to the jury that this was a
> sloppy investigation.    But to try to impeach the other
> witnesses through the defendant's statement from a witness
> who hasn't read the statement is beyond the pale. So –

> [Defense]:  Well, I'm allowing her to read the statement now.
> We have the – the detective who took the statement was on
> the State's witness list and hasn't come here. And we tried to
> subpoena him, and he's avoided our subpoena, I think twice
> now.

> THE COURT:  Who is the detective?

[Prosecutor]:  Your Honor, the only attempt to subpoena him was yesterday, or last night.

[Defense]:  Because he was on – he was on the State's witness list.

THE COURT:  But what's his name?

[Defense]:  Jeff Ferguson.  And our investigator is here.  She attempted to subpoena him yesterday.  He said he would meet her at our office.  He didn't come.  She called him back, and she went over to his home to subpoena him, and he was not there.  He's not on leave, he's in town.  He's just doing training.  He's not actually at LCPD.  So we have attempted to subpoena him twice.

THE COURT:  Where is he?

[Prosecutor]:  Your Honor, we didn't subpoena him.  He wasn't under our subpoena.  He was on our witness list, but we did not elect to subpoena him.  And as far as we knew, he was at annual training or annual leave.  We attempted to also help.  Mr. Garvey indicated to me that he couldn't find him, and we were given information that he's at annual training or annual leave today.

[Defense]:  Here in town.

[Argument whether Detective Ferguson could even testify to the statement, if he took the stand].

THE COURT:  Well, if you can find him, then bring him in.  But this witness won't be allowed to testify to what is on a statement that is – it's improper impeachment.

*See id.* at 44-50.

After a renewed the request to cross-examine Thacker, Judge Driggers allowed defense counsel to make a record of their efforts to locate Detective Ferguson.  *See id.* at 60-62.  After hearing testimony from its investigator, the defense argued Detective Ferguson made himself "unavailable," and so they should be permitted to cross-

examine Detective Thacker as originally planned.  Judge Driggers again denied the motion.  *See id.* at 65-69.

Petitioner asserts that counsel was ineffective in failing to "secure Detective Ferguson as a defense witness, to establish that Petitioner did not fabricate his statement with respect to the alleged victim having first thrown a [S]onic cup with soda at Petitioner and the codefendant."  *Doc. 8* at 15-16.  Judge Schultz rejected this claim[8] for the reasons given by the State:  Petitioner saw Alize in the car holding her Sonic cup,[9] the Detective's testimony would have been inadmissible because extrinsic evidence cannot be used to impeach, and the defense made significant reasonable efforts to subpoena the Detective.  *See Doc. 16-3* at 60-64.

According to the testimony of the defense investigator, she spoke with Detective Ferguson at 5:00 p.m. on the day before he was to testify, told him she had a subpoena for him to appear the next morning, and, although he told her "he would come over to the police department and to pick up the subpoena [she] waited for about 45 minutes [and he] did not show up."  *Transcript II* at 66.  When she called his phone again, "he did not pick up."  *Id.*  When she went to his home and saw lights on inside, no one answered her knock.  *Id.*  She left the subpoena on the door that night, and when she returned in the morning the subpoena "was not on the door anymore."  *Id.* at 67.  When she contacted Detective Ferguson's supervisor, she was told he "was a training."  *Id.*

---

[8] Petitioner did not raise this claim in his pro se state petition.  *See Doc. 16-2* at 33.

[9] Based on the transcript, there was no witness testimony to that effect.  Instead, the prosecutor stated this is what Petitioner saw based on her recollection of what the defense mentioned in opening statement (which this Court does not have) and based on what the prosecutor believed Mendoza would later say (which did not occur).  *See Transcript II* at 62 ("The defendant, through – well, through Felicia, who I anticipate will say – said that they saw Alize – in their opening statement – Alize jumping around.  She was holding a Sonic cup.").

The prosecutor did not offer any evidence or argument that contradicts the investigator's version of events.

Thus, Judge Shultz's conclusion that this does not amount to ineffective assistance of counsel is not unreasonable.  "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney," and it is error for a court to suggest that "counsel had to be prepared for any contingency."  *Harrington,* ___ U.S. at ___, 131 S.Ct. at 791.  "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."  *Id.*  One would hope that law enforcement officers who renege on their word and avoid subpoenas are rarities.[10]  Thus, Petitioner fails to establish the requisite deficiency prong under *Strickland.*

Petitioner also fails to establish the prejudice prong.  Petitioner argues that's without Detective Ferguson testifying to what Petitioner related at the scene, the jury would believe he "fabricated" that the others threw the drink first.  Although the Court does not have a copy of the entire transcript, several things are clear from the present record.  Petitioner contends the prejudice flows from counsel's inability to call Detective Ferguson such that Petitioner's "credibility" was at stake.  The Court finds that the asserted prejudice could not have occurred in the context of the particular circumstances of his trial.

---

[10] Contrary to what the prosecutor suggested by cross-examination, defense counsel's belated decision to subpoena Detective Ferguson on the evening that the State was wrapping up its presentation is perfectly understandable rather than sloppy preparation.  The detective was on the State's witness list, and the defense could have been expected to wait as long as possible to make a final decision on whether Petitioner would testify.  *See Transcript II* at 67 ("Q.  So you just started looking for him yesterday?  A.  Right . . . I got a call . . . about 4:45, and I was at the police station about 5:00.")

First, defense counsel's opening statement theorized that Trista and Contreras were making false accusations because of their dislike of Petitioner.   *See Doc. 8* at 9; *Transcript II* at 127, 146, 164.   Second, the substance of Petitioner's statement to Detective Ferguson about who threw the first drink was not before the jury from the testimony of the prosecution witnesses or Mendoza.[11]   Third, Petitioner did not testify. Fourth, defense counsel used Mendoza's testimony to establish that she observed that the cups were from a Sonic Restaurant and thereby undermine the credibility of Trista and Contreras and their version of events:

> Now there are some other things about [Mendoza's] testimony, but I think it should be fairly convincing.   For one thing, she admits to some fault in this, right?   And I'm talking here about the cups, right, the throwing of the cups.
>
> Now she said, "They threw cups first.   I threw one back."   And you know, it's clear now that's not any sort of a defense to the charges against Ernesto that they threw cups after he allegedly swerved his car at the other car.
>
> But it's – basically what it is, it's a truth factor.   She said they threw these cups, they were Sonic cups, which is exactly where these witnesses . . . all said they had come from.
> How did she know that detail?   How did she know those were Sonic cups?
>
> Now it could – it would have been easy, you know, if – if they had been inclined to, they could have said, "Yeah, we threw the cups, but after he – he drove at us."   But they're showing you what they're doing by their inability to accept any – any fault in this.

*Transcript II* at 153-61.

---

[11] Mendoza initially lied to the police that she was driving the car and that topic was discussed in her testimony.   In that context, she testified that, although Petitioner told her he had not given a statement to the police when they were under arrest and being transported, an officer later told her that Petitioner had given a statement and told them Mendoza was driving, a ruse he and Mendoza had agreed to maintain because Petitioner did not have a driver's license.   *See Transcript II* at 113-14.

Accordingly, Petitioner does not establish either *Strickland* prong with respect to this claim.

### C. Prosecution Witness Credibility – Bolstering By Detective Thatcher

Claims "K" and "L" fault counsel for not initially objecting to Detective Thatcher's "hearsay" and "irrelevant" testimony that "bolstered" Trista and Contreras' testimony, and for not requesting a limiting instruction once counsel did object. *Doc. 8* at 15. Judge Schultz denied the claim based on the arguments by the State. *See Doc 16-3* at 59, 64. Habeas counsel's response is vague about precisely which portion of the testimony was objectionable. *See Doc. 26* at 9-10. The vagueness of the claim alone is grounds to deny federal habeas relief. [12] Having thoroughly reviewed the entire record however, the Court believes counsel may be challenging the entirety of the Detective's testimony.

The prosecution called three law enforcement officers to testify: (1) police officer Rick Garcia, who was sent to the scene by Central Dispatch after it received Trista's 911 call; (2) Detective Irma Palos, who Trista also called once they were stopped;[13] and (3) Detective Thatcher, who Detective Palos asked to accompany her to the scene.

---

[12]  A "claim" can be so broadly-worded and vague that it fails to present any allegation that would be cognizable by this Court. *See, e.g., Champ v. Zavaras,* 431 F. App'x 641, 646 (10th Cir. 2011) ("Mr. Champ's conclusory assertions that his due-process rights were violated, absent more, do not demonstrate that he is entitled to habeas relief."); *Weedman v. Hartley,* 396 F. App'x 556, 560 (10th Cir. 2010) ("Conclusory allegations that counsel was ineffective are not sufficient to warrant habeas relief."); *Carter v. Ortiz,* 184 F. App'x 682, 684 (10th Cir. 2006) ("As for Carter's allegations concerning the Corrections Corporation of America, we conclude they are too vague to state a valid claim for federal habeas relief.").

[13] Trista left a message that Petitioner and Mendoza had run them off the road and that they were waiting for police at a car dealership. The jury never heard the message – it was garbled and defense counsel argued it was cumulative of the 911 call that the jurors did hear. *See, e.g. Transcript I* at 102-05, 151-55.

Officer Garcia testified about seeing the two cars while they were travelling along the road, where he observed Trista's car at the side of the road, and how he approached and dealt with Petitioner and Mendoza where their car was stopped at the car dealership. *See Transcript I* at 171-96. Detective Palos testified as the last witness of the first day. She simply said she was "dispatched" to scene," and did not mention the phone call she received from Trista. Her brief testimony recounted her observations of people on the scene – Trista, Contreras and Alize were "upset" and Mendoza was gesturing with her middle finger toward Trista. *See id.* at 198-203.

The next morning the prosecution as its last witness case agent Detective Thatcher. *See Transcript II* at 17. Detective Thatcher had limited personal involvement at the scene of the crime and with those involved. In her capacity as case agent, however, she was responsible for investigating and assisting in the preparation and prosecution of the case. Detective Thatcher repeated the sequence of events and locations of vehicles that were already in evidence from Trista, Contreras, and officer Garcia. *See id.* at 20-23. Rather than objecting, the defense asked to approach the bench and stated that it "let this [testimony] go on for a while, but [it] appears to be all hearsay." *Id.* at 23. The prosecutor responded that Detective Thatcher had been "asked . . . to just go over the scene . . . to just lay out the area" from information she gathered "from both interviews and her investigation . . . she oversees the entire case." *Id.*

Judge Driggers responded: "You might ask her to do – help you with closing argument, because that's what it sounds like." *Id.* at 24. He said he "sustained" the defense "objection," but also allowed the Detective to continue testifying at length about

the scene and summarizing the events.  The defense did not object throughout this

testimony.  *See id.* at 23-35.

Then, Detective Thatcher concluded her testimony with this brief exchange:

> [Prosecutor]:  You took statements from Trista Lopez, Felicia Mendoza, and Johnni Rae Contreras, and you have been sitting here through most of the trial.  **Were those statements that were given to you back on the date of the incident consistent with what they testified to today and yesterday in court?**
>
> **A. Yes.**
>
> Q.  Same exact evidence, or same exact factual information given to you the date of the incident?
>
> A.  Yes.
>
> Q.  And in your personal opinion, Detective Thatcher, if a car –
>
> [Defense]:  Your Honor -- I'm sorry.
>
> THE COURT:  Just let her finish the question and then you may object.
>
> [Prosecutor]:  In your personal opinion, if a car is used as a weapon, could it cause either death or great bodily injury?
>
> A. Yes.

*Id.* at 36-37 (emphasis added).

Counsel argues that:

> In subclaim (k) trial counsel failed to timely object to the hearsay and bolstering testimony of Detective Kacee Thatcher, who repeated the testimony of two of the witness victims and who testified about their state of mind.  While trial counsel ultimately objected to Detective Thatcher's hearsay and bolstering testimony, he did so only after Detective Thatcher had essentially concluded that testimony, then failed to move to strike the testimony.  After the tardy

objection was sustained, Detective Thatcher then provided lengthy testimony that only repeated the testimony of the two victim witnesses (subclaim l).  Again, trial counsel did not timely object, giving Detective Thatcher the opportunity to continue her supportive testimony of the victim witnesses; it allowed her to repeat irrelevant travel route testimony, which only served to reinforce and credit the testimony of the victim witnesses.  His failure to timely object to the testimony referred to in sub claims (k) and (l) had nothing to do with trial tactics and strategy.

*Doc. 26* at 9-10.

 These arguments have no merit with respect to either *Strickland* prong.

Detective Thatcher's testimony did repeat and summarize the sequence events in detail.  However, she was not the only law enforcement officer to repeat the events as related by the victims, and Petitioner does not similarly fault counsel for failing to object to Officer Garcia's or Detective Palos' testimony to the same effect.  Furthermore, despite Judge Driggers' having "sustained" the defense objection, in context it is clear that from his tongue-in-cheek remark and in his allowing the testimony to continue at length, that he considered it legally unobjectionable, but merely cumulative.   Failure to object to hearsay or other testimony that is cumulative of other admitted testimony does not result in prejudice.[14]

---

[14] *See, e.g., Woodfox v. Cain,* 609 F.3d 774, 816-17 (5th Cir. 2010) ("this hearsay testimony was cumulative . . . .  Because the testimony was cumulative of other evidence, we cannot hold that but for counsel's failure to object the results of the trial would have been different."); *Arbucklev. Dorsey,* No. 98-2262, 1999 WL 672274, at *5 (10th Cir. Aug. 30, 1999) ("petitioner claims his counsel was ineffective for failing to object to the testimony of an investigator . . .  The investigator testified about the explanations Ms. Brown gave for the baby's injuries.  Petitioner's counsel . . . objected to this testimony as being cumulative and irrelevant, which was overruled.  Petitioner contends his counsel was ineffective for not also raising a hearsay objection to the investigator's testimony about Ms. Brown's statements.  Even assuming that counsel's failure to object to this evidence on hearsay grounds was error . . . the testimony about Ms. Brown's explanations was merely cumulative of other evidence properly admitted against petitioner.").

The highlighted statement that Detective Thatcher considered the victim's scene and trial testimony consistent does not constitute improper "bolstering."  Because witness credibility is a jury determination, prosecutors and witnesses cannot "vouch" for the credibility of a state witness.   *See, e.g., United States v. Orr,* 692 F.3d 1079, 1096-97 (10th Cir. 2012); *Bledsoe v. Bruce,* 569 F.3d 1223, 1237 (10th Cir. 2009).  "Such impermissible vouching occurs only when the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness's credibility, either through explicit personal assurances of the witness's veracity or by implicitly indicating that information not presented to the jury supports the witness's testimony."  *Orr,* 692 F.3d at 1097 (internal quotations and citation omitted). The prosecutor clearly carefully phrased the question to Detective Thatcher to avoid any such suggestion.

Even if eliciting the detective's opinion on the "consistency" of the victim's statements falls into the impermissible realm, Petitioner cannot obtain federal habeas relief.  Courts in the Second Circuit have long held that claims of "bolstering" are matters of state and federal evidentiary rules that are "not a cognizable basis for federal relief" unless the evidence is "is so extremely unfair that its admission violated fundamental conceptions of justice."  *See Diaz v. Greiner,* 110 F. Supp. 2d 225, 234 (S.D.N.Y.2000) (internal quotations and citations omitted) (and cases cited therein). Here, Petitioner cannot be deemed to have suffered any prejudice, much less extreme unfairness.  The prosecutor's broad question did not highlight or emphasize any particular portion of the victim's testimony.  Thus, even if the "consistency" question "had been omitted, the jury still . . . heard" all of the other testimony.  *Bledsoe,* 569 F.3d at 1237.  As such, the "consistency" opinion "was a very small part of the evidence

presented, and, thus, there is not a reasonable probability that, but for [it, Petitioner] would not have been found guilty." *Id.* at 1238. Therefore, the state court's "determination that this deficiency was not prejudicial is not objectively unreasonable under the AEDPA's standards." *Id.* (reversing district court's grant of habeas relief where it disagreed with state court's prejudice analysis).

### D. References To Petitioner's Status as a Prisoner

The parties discussed the subject of Petitioner's criminal record and prior incarceration on a couple of occasions during trial. As already mentioned above, the prosecution was mistaken when it asserted at sidebar that it believed defense counsel opened the door by broaching the subject in opening statement. *See Transcript I* at 87, 89-91, 94-95. The subject also came up during pretrial sidebar discussions and when Trista blurted out during her testimony that Petitioner had been incarcerated.

Count 5 charged Petitioner with threatening a witness. Pretrial, defense counsel moved to sever that charge and asked that it be tried to the trial judge because of the potential prejudice to Petitioner upon the jury learning he was also charged in the abandonment/abuse case. *See id.* at 5-7. The State argued that even if it had not pursued the charge, the circumstances surrounding the pending case would be admissible to show why Trista and the others in her car would have been concerned for their safety when he swerved his car into theirs. *See id.* at 8-9. Trista and Alize believed that Petitioner was in jail, so when Trista saw his car, she was surprised and directed her sister to stay back, indicating that she did not want Alize to realize he was "out." *Id.* at 16.

The trial judge denied the motion and allowed the charge to go forward to the jury, but set limits on what the prosecution witnesses could reveal to keep Petitioner's status from the jurors.  He ruled that witnesses could say they thought Petitioner was "unavailable," they were "surprised" when they "saw him," and Trista did not want Alize "to see him."  *Id.* at 17-18.  The prosecutor could only refer to the abandonment criminal action as a "pending matter without reference to specifically being child abuse, that [Trista] was an essential witness in a case."  *Id.* at 12.  He approved the question the State proposed posing to Trista – that she was a witness against Petitioner in a pending case, without specifying whether it was civil or criminal, or the nature of the case.  *See, e.g., id.* at 13, 97, 102, 109-11.

During Trista's testimony about her son Abel by Petitioner, she was asked whether she was living with Petitioner when she was had her son, and she blurted Petitioner "had gotten released from prison in October of '05 – I'm sorry, I think it was '04.  It was a couple of months before – it was before I had Abel.  I had Abel in November of '05, and he got released in October."  *Id.* at 85.  The defense responded with a motion for a mistrial.  *See id.* at 86-87, 89, 98.  The trial judge ruled that the state acted in good faith and did not intentionally try to elicit the information about prison.  *Id.* at 94-95.  The court cautioned Trista, out of the hearing of the jury, to not refer to incarceration and advised her that, if she did, he would hold her in contempt and declare a mistrial.  *See id.* at 93, 99-102.

The trial judge did not sua sponte advise the jury to disregard her remarks, either immediately after Trista made them, or after the lengthy proceedings outside the presence of the jury.  *See id.* at 86, 106.  During the course of ruling on the motion for a

mistrial, he had invited counsel to submit a curative instruction.  *See id.* at 95.  ("And if you want a curative instruction, I need you to prepare one for me, and I'll decide whether to give a curative instruction.").  Defense counsel responded that:  "We would like the opportunity to present a curing instruction if the Court finds that there –that a mistrial is not warranted."  *Id.* at 98.

Petitioner claims that counsel's failure to "request a limiting instruction" concerning Trista's statement amounted to ineffectiveness.  *Doc. 8* at 15.  This wholly ignores that after Mr. Garvey made the statement about desiring a curative instruction, the trial judge observed:

> I find that there's – the State did not elicit this testimony and that a curative instruction, limiting instruction – ***a curative instruction would cure any prejudice to the Defense.***
>
> And certainly, you preserve your right to appeal this if there is a conviction.  You're not withdrawing – you're not waiving – Mr. Garvey, you're not waiving your right to claim on appeal that a mistrial should have been declared and that the State should not be allowed to retry this case merely because you're going to plan B in preparing a curative instruction or a limiting instruction to the jury.
>
> That would, I think, be a Hobson's choice for the Defense.  So if the Court of Appeals feels otherwise they will let us all know.

*Transcript I* at 99.

It further ignores what Judge Schultz adopted as her reason for denying habeas relief.  *See Doc. 16-3* at 64.  That is, the next day, Mr. Garvey expressly "declined the Court's offer" of a curative instruction as a matter of strategy when he stated that "'a limiting instruction, human nature being what it is, would only reinforce the earlier

testimony regarding his prison term.'" *Doc. 16-3* at 57 (quoting *Transcript II* at 15).  He

and the trial judge had this exchange:

> THE COURT:  Anything else?
>
> MR. GARVEY:  I suppose we should address now – all right. There is discussion about whether we would seek a limiting instruction.
>
> THE COURT:  Yes, on the – on your motion for a mistrial.
>
> MR. GARVEY:  That's correct, Your Honor. And our position is that a limiting instruction, human nature being what it is, would only reinforce the earlier testimony regarding his prison term.
>
> So we do not seek a limiting instruction, that would, in fact, worsen the situation.
>
> THE COURT:  All right.
>
> MR. GARVEY:  And again, we are moving for a mistrial at this time.
>
> THE COURT:  That's fine.  I'm denying it.

*Transcript II* at 15-16.

In considering a claim of ineffectiveness, this Court "must apply a 'strong

presumption' that counsel's representation was within the 'wide range' of reasonable

professional assistance."  *Harrington,* 562 U.S. at ___, 131 S. Ct. at 787 (quoting

*Strickland,* 466 U.S. at 689).  Where the record indicates the reason for counsel's

actions, this Court "may not indulge [in] 'post hoc rationalization' for counsel's

decisionmaking that contradicts the available evidence of counsel's actions."

*Harrington,* 562 U.S. at ___,131 S. Ct. at 790 (quoting *Wiggins,* 539 U.S. at 526-27).  It

is a "rare situation" where the "'wide latitude counsel must have in making tactical

decisions' will be limited to any one technique or approach."  *Id.* 562 at 789 (quoting

*Strickland,* 466 U.S. at 689).   Especially where the record shows "'that a particular decision was, *in fact,* an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.'" *United States v. Smith,* 421 F. App'x 889, 894 (10th Cir.2011) (quoting *Bullock v. Carver,* 297 F.3d 1036, 1046 (10th Cir. 2002).

The above transcript excerpts pinpoint why defense counsel made the strategic choice to not request a curative instruction.   Not only would an instruction highlight the testimony, it could have cured any later appeals argument counsel could have raised concerning prejudice in a challenge to the trial judge's denial of a mistrial.   Because Petitioner cannot satisfy the first *Strickland* prong, the state court's decision is reasonable and that prong alone defeats the ineffective assistance of trial counsel claim.   While appellate counsel did not challenge the mistrial ruling on direct appeal, that decision by was never raised in the state proceedings or here as an independent claim.

### E.  Evidence Of Trista's Intimidation

#### (1) Background

The letter, quoted at the outset, was discussed in the context of the defense motion to sever Count 5 before trial.   Defense counsel noted some of his objections to the letter at that time and indicated he would raise them again later.   *See Transcript I* at 8-13.   Counsel and the court also discussed the letter when the prosecutor mistakenly asserted that the defense had "opened the door" on the subject of Petitioner's incarceration.   During that discussion, the prosecutor mentioned that the jurors would learn of Petitioner's incarceration from the information on the envelope, because the

letter that he writes Trista is from prison, or jail.  And that's going to come out as well, because the address on there is the address from Copper Loop.  He uses a different name.  I'm sure that's going to be disputed, as to how she knows it's his writing, why it's used under a different name, the address it comes to and where it goes to.

And, Judge, I mean when they make jail phone calls, when they make – write letters, those things are admissions and those things come in.  So the jury could be led to think that that's the place that he was at when he wrote the letter.

So I just don't think that this is prejudicial in any way. It's clear that he, at some point, is going to have been put in prison.  And I was trying to get her to move on, and I just don't think it prejudices him in any way.

*Id.* at 92.  The defense objected to introduction of the envelope but noted that the prosecution did not need to introduce "that is was from the jail."  *Id.* at 93.

After the mistrial arguments concluded, Trista's testimony resumed.  The prosecutor asked if, before the car encounter took place, "there was a case that was pending that involved [Petitioner], and you were going to be an essential witness, and you were going to testify for the other side."  *Id.* at 111.  When Trista replied "yes," the prosecutor asked her if she "receive[d] a letter or not from Ernesto Ordunez," and Trista replied, "yes."  *Id.*  After the prosecutor showed Trista the letter and she said she recognized it, the prosecutor attempted to introduce the letter into evidence and the defense objected on "several grounds," including:   (1) lack of proper authentication since the letter was not signed by Petitioner; (2) lack of relevance since it was sent months before the car incident, did not expressly threaten bodily harm, and did not mention testimony or preventing the recipient from testifying.  *See id.* at 111-114.

The trial judge found that the letter was relevant because "letter is germane to the issues . . . [i]t goes towards an element of proof, the bribery of the witness charge."

*Id.* at 116.  But the trial judge sustained the objection on the first ground and further reinforced his prior ruling that there would be no mention of Petitioner's status as a prisoner, stating:

> THE COURT:  [T]here hasn't been sufficient foundation laid for the admission of the exhibit.
>
> Counsel can ask the witness how – when she received it, how it was packaged, if you will, and how does she know that this came from the defendant.
>
> If his signature is not on it, does she recognize his recognize it?  And if so, how does she recognize it?  Has she received other correspondence?
>
> Again, be careful that you don't say the letter's from the Birmingham jail.
>
> [Prosecutor]:  I know.
>
> THE COURT:  But you will need to lay a foundation.
>
> [Prosecutor]:  Okay.
>
> * * * * *
>
> THE COURT: You will need to establish the time prior to and the relationship between the parties prior to the letter being written, and if that relationship changed in any way from October 2006 to January 17, 2007, before the Court allows its admission.  That's part of the foundation.
>
> [Prosecutor]:  Judge, I need to establish that the relationship changed?
>
> THE COURT:  Well, the letter was written for a reason.  And if you're claiming that reason is to threaten her into silence, then you have to have in context what the nature of their relationship was.
>
> [Prosecutor]:  But that was –
>
> THE COURT: I assume they weren't seeing each other at that time.

[Prosecutor]:  No, because the baby case was pending.

THE COURT:  Well, I know.  You just say that – you just say that they didn't have a good relationship during this period of time.

[Prosecutor]:   Okay.

\* \* \* \* \*

THE COURT: Be delicate there, because I know we're on thin ice.

[Prosecutor]: Yeah.

THE COURT: But if you can show a nexus between the letter in October of '06 and the incident on January 17, '07, that the nature of their relationship was such that she had reason to be concerned about him, that's your whole case.

[Prosecutor]:  Right.

THE COURT:  So if you can tie that in,  but that she needs to authenticate this letter and satisfy the Court –

[Prosecutor]:  Okay.

THE COURT:  – that it was written by the defendant.

[Prosecutor]:  Okay.

*Id.* at 114-18.

The prosecutor quickly satisfied the Court's requirements for admission by a few questions that did not elicit any discussion about prison.

[Prosecutor]:   [Trista], do you recognize the writing in this letter?

A.  Yes.

Q.  And whose writing is that?

A.  Ernesto's.

Q.  Ernesto Ordunez'?

A.  Ordunez.

Q.  And had you seen his writing before?

A.  Yes.

Q.  And this letter was – you received it – it was mailed August 31st, 2006; is that right?

A.  Yes.

Q.  And when you received this letter, was the other case already pending?

A.  Yes.

Q.  And your relationship between Ernesto Ordunez, at the time that you received this letter, was it – what was it – what was it like?

A.  There was no relationship.

* * * * *

Q.  And here, it's addressed to an Yvette Marie.

A.  Yes.

Q.  Do you know who that is?

A. My stepsister.

Q.  And is her name Yvette Marie Arzabol?

A.  No.

Q.  What is her name?

A.  Her name is Yvette Arzabol.  Marie is my middle name.

Q. And what is -- Marie is in quotations and underlined?

A. Yes.

Q. Did that mean anything to you, when you got –

A. That it's for me.

Q. And this address . . . what address is that?

A. That used to be her old address.

Q. At the time that you received this letter, was she living there?

A. Yes.

Q. And when she received this letter . . . did she call you and tell you or what happened?

A. She called me and told me that I had a letter there.

Q. And had she opened it up?

A. No.

Q. How did she know it was to you?

A. Because of the Marie.

Q. And it says it's from a Jesus Mata. Did you know a Jesus Mata?

A. I have no idea who that is.

Q. But even on the envelope, do you recognize that writing?

A. The writing, yes.

Q. And that is?

A. Ernesto's.

Q. And in this letter, without telling us yet what it says, it talks about some private information that maybe you either had shared, or that a person might – would have to know to know

this information?

A.  Yes.

Q.  Had you shared some of this information?

A.  No.

Q.  Would there be some way that Ernesto would have known at least some of these details?

A.  Yes.

Q.  And how would he have learned those?

A.  From me.

Q.  When you got this letter, did you feel somehow intimidated, or that he was trying keep you from – from –

[Defense]:  Objection, Your Honor,

THE COURT:  Yes, but I will allow it for this purpose.

[Prosecutor]:  Did you feel that somehow he was trying to prevent you from maybe testifying –

A.  Yes.

Q.  – in that other case?

A.  Yes.

*Id.* at 118-21.

### (2)  Admission of the Letter

Petitioner raises two claims with regard to admission of the letter:  (1) trial counsel was ineffective in failing "to keep the August 31, 2006 letter out of evidence," *Doc. 8* at 15; and (2) ineffective in failing to "object to the trial court directing the state how to establish a foundation for the admission of the letter," *id.*

The defense raised admission of the letter on direct appeal, arguing that the trial judge erred in finding probity outweighed prejudice. *See Doc. 16-2* at 34, 50-52. The Court of Appeals rejected the claim and disagreed with the defense that the letter was irrelevant. It explained that the letter was relevant to "show the deteriorating relationship between Defendant and the victim and explain motive for the motor vehicle incident," and thus, "it does not matter when it was written." *Doc. 16-1* at 60; *see also id.* at 40. It found that the "inflammatory statements" in the letter that "might arouse sympathy for the victim," did not "outweigh the probative value of the letter." *Id.* at 40-41.

The defense also injected an ineffectiveness argument in the memorandum in opposition to the first proposed, summary affirmance, but the Court of Appeals ignored the claim and the New Mexico Supreme Court did not mention it when it denied certiorari. *See, e.g., Doc. 16-1* at 53, 58-62, 67-69, *Doc. 16-2* at 2.

In the state habeas proceedings, the State noted that the Court of Appeals ruled the letter was properly admitted, the trial judge overruled any objections the defense made to admissibility, and the petitioner was "unclear" how defense counsel "were supposed to convince the [trial judge] that items should not be admitted." *Doc. 16-3* at 58. Judge Schultz adopted these reasons in denying the claim. *Id.* at 64. As for the trial judge's discussion of the groundwork necessary to admit the letter after he sustained the defense objection, in the state habeas proceedings, the State argued that "Defendant fails to cite any case, rule or statute that makes this behavior objectionable." Judge Schultz denied, the claim, in part, because a "judge does not show favorism by

requiring the parties to satisfy his or her particular interpretation of the rules of evidence." *Id.* at 58-59; *see also id.* at 64.

Petitioner's claims here are conclusory and vague, and abandoned since they are left unaddressed in habeas counsel's response. This is sufficient grounds to deny them without further discussion. *See Doc. 26.* In addition, however, admissibility of evidence is a matter of state law, and "[i]t is not the responsibility of a federal habeas court to cure errors from the state court concerning state law." *Durbin v. Province,* 448 F. App'x 785, 787 (10th Cir. 2011) (citing *Estelle v. McGuire,* 502 U.S. 62, 68 (1991)). Habeas relief cannot issue unless an evidentiary ruling violates the federal Constitution, laws or treaties. *Id.* A court will grant habeas relief only if an evidentiary ruling is "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Id.* (internal quotations and citations omitted).

The admission of the plainly relevant letter, and the Judge's unsolicited instruction at sidebar to facilitate admission of that evidence, do not even approach that threshold. *See, e.g., Copeland v. Walker,* 258 F. Supp. 2d 105, 135 (E.D.N.Y. 2003) (though "prejudicial intervention by trial judge" could violate due process, trial judges "are accorded significant leeway" and "standard of review is even more limited where a federal court is asked to review the conduct of a state court judge" and "questions concerning a judge's partiality or intervention rarely rise to the level of a constitutional claim because the Due Process Clause establishes a constitutional floor, not a uniform standard") (internal quotations and citations omitted).

### (3)  911 Call

Petitioner maintains that defense counsel's failure to exclude Trista's 911 telephone call constitutes ineffectiveness.  *Doc. 8* at 15.  Habeas counsel failed to discuss what this claim entails in the state proceedings and here, and such vague and conclusory assertions cannot be the basis for federal habeas relief.  *See Doc. 26; Doc. 16-3* at 58.

### (4)  No Expert to Challenge The Letter

Petitioner raises two claims with regard to admission of the letter:  (1) counsel should have consulted with Petitioner so he could have directed counsel to retain an expert; *Doc. 8* at 14, and (2) counsel should have consulted and retained an expert witness to "State's claim that the signature on the letter was the Petitioner's," *id.*  The defense raised the claim about the lack of a defense handwriting expert in state habeas, and Judge Schultz rejected the claim for the reasons submitted by the State, *Doc. 16-3,* which included "various" alternative "ways" the prosecution established the "veracity" of the letter as Petitioner's, *see id.* at 53-54.

Here, habeas counsel argues that Trista's testimony was the only evidence introduced by the State on the bribery charge, and part of the evidence on the aggravated assault charges, she was a "hostile witness" whose testimony about his "handwriting was self-serving."  *Doc. 26* at 6-7.  Because "trial counsel failed to hire a handwriting expert," Petitioner had no way of rebutting [her] uncontested testimony on this crucial point," since any cross-examination about the issue of the "highly personal information" would have simply elicited "self-serving responses that would only have

served to reinforce her testimony and show the jury that trial counsel had no proof

otherwise." *Id.*

Although defense counsel could have hired an expert to challenge whether

Petitioner wrote the letter, failure to do so is the sort of tactical decision about which this

Court cannot make "post hoc rationalizations," *Harrington,* 131 S. Ct. at 790, and

instead must evaluate counsel's conduct from 'counsel's perspective at the time,'" *id.* at

789 (quoting *Strickland,* 466 U.S. at 689).  On the specific subject of experts, the

Supreme Court explained that:

> Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both.  There are, however, "countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way." . . .  It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it. . . .
>
> From the perspective of . . . defense counsel . . . there were any number of hypothetical experts—specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines—whose insight might possibly have been useful. An attorney can avoid activities that appear "distractive from more important duties." . . . Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. . . .

*Id.* 788-89.

A challenge to the authorship of the letter was a patently obvious option defense

counsel could have pursued in Petitioner's case, but "[a]n attorney need not pursue an

investigation that would be fruitless, much less one that might be harmful to the

defense." *Id.* at 790-91.  Accordingly, this Court finds that Petitioner fails to establish the first *Strickland* prong.  Consequently, the state decision that concludes Petitioner's claims concerning failure to retain an expert are without merit, is not unreasonable. Since the claim fails on the first prong, this Court need not separately address the prejudice inquiry.

### (5)  Trista's Behavior Showing Lack Of Intimidation

Petitioner's argues that defense counsel should have investigated:  (a) the circumstances surrounding Trista's visits to the local jail to see Petitioner, and (b) when she called the District Attorney's office to inquire about Petitioner's whereabouts.  He claims that had counsel done so, counsel could have called witnesses disputing Trista's credibility about whether she was frightened of Petitioner and/or accidentally encountered him on the street in his car.  See *Doc. 8* at 14-15.  In his response, habeas counsel again argues that, as with the handwriting expert, the prosecution's case hinged on the jury's view of Trista's credibility, and that the defense could not have impeached her through cross-examination without these two lines of evidence.  *See Doc. 26* at 7-8.

These lines of questions would also open the door to Petitioner's incarceration, however, and possibly his prior convictions.  Moreover, in considering a claim of ineffectiveness, this Court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington,* 562 U.S. at ___, 131 S. Ct. at 787 (quoting *Strickland,* 466 U.S. at 689).  In the Tenth Circuit, counsel's decisions on how to cross-examine are matters of trial strategy that fall within the presumption.  *See, e.g., DeLozier v. Sirmons,* 531 F.3d

1306, 1326 (10th Cir. 2008); *Pickens v. Gibson,* 206 F.3d 988, 1002 (10th Cir. 2000).

The fact that counsel did not act as Defendant requested itself is not dispositive of

unreasonableness.

> the lawyer has—and must have—full authority to manage
> the conduct of the trial.  The adversary process could not
> function effectively if every tactical decision required client
> approval. . . .  Putting to one side the exceptional cases in
> which counsel is ineffective, the client must accept the
> consequences of the lawyer's decision to forgo cross-
> examination, to decide not to put certain witnesses on the
> stand, or to decide not to disclose the identity of certain
> witnesses in advance of trial.

*Taylor v. Illinois,* 484 U.S. 400, 417-18 (1988).

### F.  Closing Argument

Petitioner asserts that the prosecutor indirectly referred to his failure to testify

twice during closing argument.  *See Doc. 8* at 16.

Instruction 13 to jury provided:  "You must not draw any inference of guilt from

the fact that the defendant did not testify in this case, nor should this fact be discussed

by you or enter into your deliberations in any way."  *Doc. 16-1* at 14.  The trial court read

the instructions to the jurors before closing argument.  *See Transcript II* at 126.  During

subsequent closing arguments, *see id.,* the prosecutor recounted several instructions

including this one, by saying, "we ask that you follow the law and the instructions that

you are given.  You can't speculate or guess or draw any inference from the fact that

this defendant did not testify in this case."  *Id.* at 145.  The defense interrupted and

objected, arguing:  "the State has just made a reference to my client not testifying from

the jury instruction.  I'm moving again for a mistrial," but the trial judge overruled the

objection.  *Id.; see also id.* at 146 ("THE COURT:  And how is that objectionable?  MR.

GARVEY:  Your Honor, the State is not allowed to draw attention to the fact that my client has chosen not to testify in this matter.").  Here, habeas counsel argues that "trial counsel failed to timely object to the state prosecutor's closing arguments," *Doc. 26* at 11, but makes no attempt to explain how this objection, which actually interrupted the prosecutor, was untimely.

Habeas counsel also makes a vague reference to a second statement by the prosecutor during closing argument about "Petitioner's failure to rebut the state's presentation," to which "counsel failed to object."  *Id.*  It is not clear whether counsel means the prosecutor's first sentence in rebuttal, which the Court of Appeals considered, *see, e.g., Doc. 16-1* at 39; *Doc. 16-3* at 61-62, or the prosecutor's point immediately following the bench conference where the first objection was overruled, when the prosecutor said:

> Ladies and gentlemen, despite the voir dire, despite the opening statement that the Defense Counsel tried to feed you saying that it was going to be about jealousy, it's going to be about Felicia Mendoza and Trista Lopez and their animosity and dislike for each other, that's what this case is about, it's not.
>
> You have heard the evidence. You have heard the testimony. The only problem Felicia Mendoza and Trista Lopez share is Ernesto Ordunez.  He could have avoided the entire situation that day.  Every piece of evidence, every piece of testimony, including that of Felicia Mendoza, only gave you one story.

*Transcript II* at 147.  The prosecutor's rebuttal began with the statement:

> Ladies and gentlemen, during the past two days you have heard absolutely nothing, absolutely nothing from this stand, that told you that Johnni Rae Contreras was the one that swerved.  Absolutely nothing.
>
> So it doesn't require you to speculate, it doesn't

> require you to guess, it doesn't require anything, because
> you have heard nothing from that stand to say that it was not
> that man, Ernesto Ordunez, that did the swerving.

*Id.* at 165.

The Court of Appeals rejected the claim on direct appeal that comments by the prosecutor violated Petitioner's Fifth Amendment rights. *See Doc. 16-1* at 32-34, 47-50; *Doc. 16-2* at 2. Perhaps unaware that the prosecutor's first comment was actually a reiteration of the jury instruction or that the trial judge did not instruct the jurors during closing argument, *see Doc. 16-1* at 32, 44, 49-50, it held that the trial judge's "curative" instruction "to the jury cured any potential harm from the prosecutor's [first] statement regarding Defendant's right not to testify." The second prosecutorial comment was found to "comment on a lack of defense witnesses to contradict the prosecution's witnesses. *Doc. 16-1* at 38-39; *see also id.* at 59; *Doc. 16-2* at 17. The State reiterated the Court of Appeals' holdings as res judicata and justification for denying habeas relief on an ineffectiveness claim. *See Doc. 16-3* at 61-62. Judge Schultz adopted that argument. *See id.* at 64. All of the state decisions are "reasonable" under AEDPA standards of review.

None of the references made by the prosecutor use language "manifestly intended" or of "such a character" that the jurors "would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Herron,* 371 F. App'x 913, 915 (10th Cir. 2010) (internal quotations and citation omitted); *see also, e.g., Davis v. Embry,* No. CIV–11–79–W, 2011 WL 6057866, at **7-8 (W.D. Okla., Oct. 27, 2011) (and authorities cited therein). Indeed, the jurors here would have been completely unjustified in coming to any such conclusion when the prosecutor specifically

referenced the proper jury instruction concerning their inability to consider Petitioner's failure to testify.

Nor were the remarks improper "indirect comment" because they did not remotely suggest "matters that could have been explained *only* by the accused." *Pickens,* 206 F.3d at 999 (internal quotations and citation omitted) (emphasis added); *see also, e.g., Davis,* 2011 WL at **7-8 (and authorities cited therein). "A prosecutor . . . is . . . free to comment on a defendant's failure to call certain witnesses or present certain testimony." *Pickens,* 206 F.3d at 999 (internal quotations and citations omitted); *see also, e.g., Miller v. Province,* No. 12–5185, 2013 WL 409968, at *3 (10th Cir. Feb. 4, 2013) (prosecutorial comment based on the evidence before the jury is proper, while comment insinuating that it was based on personal knowledge is "highly improper") (citing *Lawn v. United States,* 355 U.S. 339, 359 n.15 (1958), and *United States v. Lopez–Medina,* 596 F.3d 716, 740 (10th Cir. 2010)).

Since the prosecutor's comments were unobjectionable, counsel was not deficient in failing to object, and Petitioner suffered no prejudice as a result of them.

### G.  Cumulative Prejudice

In his response, habeas counsel argues that "[t]rial counsel's multiple failures resulted in his ineffective assistance of counsel.  Cumulatively, they undermined the proper functioning of the adversarial process.  Because of this, the proceeding cannot be relied upon as having produced a fair trial." *Doc. 26* at 12.  However, "[b]ecause the sum of various zeroes remains zero, the claimed prejudicial effect of [trial counsel's] cumulative errors does not warrant habeas relief." *Spears v. Mullin,* 343 F.3d1215, 1251 (10th Cir. 2003).

Wherefore,

**IT IS HEREBY RECOMMENDED AS FOLLOWS:**

1.  Per habeas counsel's position and/or the Court's findings above, the Second Amended Petition be considered amended to have dropped the sufficiency of the evidence claim and the unexhausted ineffectiveness claim "J;"

2.  The Motion to Dismiss *(Doc. 17)* be granted and the petition as amended above, be denied as without merit; and

3.  No certificate of appealability issue.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

_____

UNITED STATES CHIEF MAGISTRATE JUDGE